ZEHMER, Judge.
The City of Alachua and its insurance carrier appeal the deputy commissioner’s order finding that claimant suffered a com-pensable heart attack arising out of and in the course of his employment and awarding permanent total disability benefits, attorney’s fees, interest, medical fees, and penalties. The employer and carrier raise four issues for review: (1) whether the deputy erred in finding that claimant’s heart attack was compensable; (2) whether permanent total disability benefits were properly awarded under the evidence; (3) whether penalties were properly awarded; and (4) whether the award of attorney fees was proper. We affirm in part, reverse in part, and remand.
The record reveals that claimant was the chief of police for the City of Alachua. He had a prior history of angina and coronary heart disease. The deputy made the following findings:
On December 1, 1983, the Claimant, as a bonded Sheriff’s Deputy, was asked by the State Attorney’s office to serve a search warrant on the residence of John Englehorn in Alachua, Florida. The warrant was served and the individual was arrested for possession of contraband, including fire arms and controlled substances. Beginning that night the suspect stated his intentions that “he would get the Chief but that he didn’t know how, but he would get him one way or another if it was the last thing he ever did in his life.” From that point forward, the individual took a personal interest in harassing not only the Claimant, but also the Claimant’s wife. The methods of harassment included the suspect catching the Claimant’s wife at the local post office or the grocery store, walking up behind her, making snide remarks, cutting remarks which the Claimant and his wife interpreted as threats. Thereafter *47 the suspect and his two sons began a campaign of coming by the Claimant’s office and standing across the street and continuously making jeering remarks about the Chief as well as taking other actions to harass the Chief including taking bags of material, hiding them under their coat and running as if they were hiding narcotics. This campaign of harassment continued throughout the month of December. On December 27, 1983 the Claimant was admitted to the emergency room of Alachua General Hospital complaining of apparent indigestion. He was admitted for possible heart problems, however, an electrocardiogram (ekg) proved negative for a cardiac arrest, or myocardial infarction. A subsequent cardiac catherization showed that the Claimant had coronary artery disease. The cardiologist cleared the Claimant’s return to work on January 2, 1984.
On January 24, 1984, the Claimant, while sitting in his office as Chief of Police of the City of Alachua was accused by the suspect of numerous unlawful acts including stealing $50,000 from the City. When the suspect persistently requested an additional copy of the City’s budget and was refused, the suspect began to call the Claimant a “communist,” “a Nazi,” and to stress that the Claimant had “hiring policies against blacks.” The suspect then began to scream at the Chief and curse the Chief to the degree that the Chief then asked the suspect to leave his office. The suspect then got right in the Chief’s face and began screaming at him and all of a sudden reached up and knocked the Chief against the wall and a physical altercation ensued which resulted in the Chief and the suspect banging around the room until a deputy came into the office and arrested the suspect for battery and disorderly conduct. The uncontroverted evidence in the case was the duties of the Chief of the Police, unlike that of his subordinate personnel did not usually require physical exertion or physical apprehension of criminals. On January 25, 1984 the Chief returned to his treating physician Dr. Billy Brashear and was given additional sublingual nitroglycerin tablets to replace those which he had had to take due to the severe angina of January 24, 1984. The Claimant reported to his doctor that he had become very angry and excited in the course of his work as a policeman and severe pain had ensued. The doctor, on that occasion approved the Chief’s return to work, recommending that he take prophylactic nitroglycerin before having contact with the individual suspect. Over the next 13 days the suspect engaged in harassing tactics including continuous surveillance of the Chief’s house by parking across the street and standing in front of his car and staring at the house and continuing to threaten the Chief by various methods of harassment, including writing accusatory articles regarding the Chief in the local newspaper. The harassment continued to such a degree that the Claimant would not allow his wife to go to work or to the grocery store without being accompanied by the Claimant for fear that she would be harassed by the suspect. On February 7, 1984, the Chief had day long depositions regarding the original December case against John Englehorn. The Chief took nitroglycerin tablets before taking the deposition, but upon arriving at the depositions outside the Courthouse in plain view of the public, the individual began to scream epithets at the Chief including telling the Chief that he was going to get him, “that he was a Communist and a Nazi” and that when this was over the suspect would own his home. The Chief testified to extreme anxiety over these confrontations. At the end of the depositions, the Chief returned home having been threatened by Englehorn with a lawsuit and deprivation to the Claimant’s family. Upon returning home the Chief felt ill and did not go back to the station. He received a phone call from the office and was notified that there was a problem in the office in that the electricity of the suspect had been cut off for non-pay *48 ment and that the suspect was on his way to the police office at that time to confront the dispatcher. The Chief upon hanging up the phone began to have severe pains and a rescue unit was dispatched from the police department to transport the Chief to Alachua General Hospital.
Upon his arrival at Alachua General Hospital, he was treated by Cardiologist Burton Silverstein and subsequently by his regular physician, William Brashear, both who concurred that he had suffered a myocardial infarction on February 7, 1984. The Chief has not returned to work from that date and the physicians have indicated he can no longer engage in law enforcement work.
The record contains competent, substantial evidence that supports the deputy’s finding of fact as to causation. Following the January 24 battery, which itself caused sufficient stress and resulting symptoms to require immediate treatment for claimant’s heart condition, claimant was subjected to continuous harassment and threats to himself and his family, thereby sustaining the heightened level of stress from January 24 finally culminating in claimant’s heart attack on February 7, 1984. The medical and lay testimony[1] indicate that these events formed an unbroken chain of causation between the battery of January 24 and claimant’s heart attack sufficient to support the deputy commissioner’s finding of compensability. Reynolds v. Whitney Tank Lines, 279 So.2d 293 (Fla.1973). The January 24 battery was itself a compensable injury, Popiel v. Broward County School Board, 432 So.2d 1374 (Fla. 1st DCA 1983), and thus sufficient to satisfy the requirement in Reynolds that the identifiable physical event triggering the chain of causation ultimately leading to the heart attack be a compensable accident.
We distinguish Russell v. State, Department of Corrections, 464 So.2d 1202 (Fla. 1st DCA 1984), in which we affirmed the deputy’s denial of compensability of a heart attack because the asserted identifiable event involved no impact, touching, or battery to claimant, and no medical care or treatment was rendered to claimant until some fifteen days later. On these facts, the deputy found there was no identifiable event that was, itself, compensable which triggered the heart attack. Unlike Russell, here there was such an identifiable event, immediate treatment for the heart condition was required, and the requisite causal relationship to the ensuing heart attack was shown to the deputy’s satisfaction. As stated by the Supreme Court in Reynolds:
It seems clear that where a heart attack follows a compensable accident the question of causal relationship must be determined on a case by case basis.... We have recited the testimony and report of Dr. Armstrong on this issue, and it is our opinion that this evidence, coupled with the testimony of claimant and his wife to the effect that claimant became increasingly nervous and began to suffer shortness of breath after the second accident, constitute competent substantial evidence of causal relationship sufficient to uphold the award of the Judge of Industrial Claims.
279 So.2d at 297.
Since the employer and carrier unsuccessfully contested compensability of the claim, the deputy commissioner properly held them responsible for payment of attorneys fees. § 440.34(3)(c), Fla.Stat. (1983).
As to Points 2 and 3, we conclude that it was error for the deputy commissioner to award permanent total disability benefits because the application for hearing, notice of hearing, and pretrial stipulation sheet failed to provide notice to the employer and carrier that these benefits were being claimed. Rule 4.080(a), Fla. W.C.R.P.; Sparton Electronics v. Heath, 414 So.2d 642 (Fla. 1st DCA 1982). We *49 also reverse the award of penalties because the carrier timely filed a notice to controvert. Since the order is otherwise devoid of any findings of fact supporting an award of penalties, we remand for further consideration of this question. Rule 4.080(b), Fla. W.C.R.P.
AFFIRMED in part, REVERSED in part, and REMANDED.
BOOTH, C.J., and NIMMONS, J., concur.

. Although somewhat equivocal, the medical testimony is sufficient, when read in its entirety and in context, to support the inferences of causation drawn by the deputy commissioner between the battery and the heart attack.